UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| KATHRINE FOSTER | CIVIL ACTION |
| VERSUS | NO. 22-1519 |
| EVONIK CORPORATION, ET AL. | SECTION: "J"(4) |

## ORDER & REASONS

Before the Court are two *Rule 12(b)(6) Motions to Dismiss* **(Rec. Docs. 3, 11)** filed, respectively, by Defendants, Shell Oil Company ("Shell") and Evonik Corporation ("Evonik") (collectively, with Shell, "Defendants") and an oppositions (Rec. Docs. 7, 12) filed by Plaintiffs, Ervin Foster, Rachelle Adams, Eyashica Foster, and LaCorey Foster ("Plaintiffs"). Having considered the motions and legal memoranda, the record, and the applicable law, the Court finds that Shell's motion (Rec. Doc. 3) should be granted, and Evonik's motion (Rec. Doc. 11) should be denied.

## FACTS AND PROCEDURAL BACKGROUND

This case arises out of alleged exposure to ethylene oxide ("EtO") near a petrochemical plant located in Reserve, Louisiana ("the facility"), owned and operated by Defendants, Evonik and Shell. Shell owned and operated the facility from 1991 until 1999, and Evonik has owned and operated the facility since that time. Plaintiffs, individually and on behalf of their deceased wife and mother, Kathrine Foster, allege that emissions of EtO from the facility caused Mrs. Foster's breast cancer diagnosis in 2019 and subsequent death in 2022.

Originally, this suit consisted of fourteen Plaintiffs ("Original Plaintiffs") who are Louisiana residents who live within seven miles of the facility. The Original

1

Plaintiffs have either contracted cancer, or has a spouse die from cancer, allegedly because of unknowing exposure to dangerous levels of EtO emitted by the facility. On April 26, 2021, the Original Plaintiffs filed suit in the Civil District Court for the Parish of St. John the Baptist, alleging that inhalation of EtO emitted from the facility was a substantial factor in causing plaintiffs' cancer, or their spouses' cancer. On June 4, 2021, Evonik removed the case to federal court, and it was allotted to Judge Sarah Vance.

On November 5, and 9, 2021, respectively, defendants Shell and Evonik filed motions to dismiss the Original Plaintiffs' complaint ("Original Complaint") under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Both movants contended that plaintiffs' claims against them were time-barred, because suit was filed after the termination of plaintiffs' one-year prescriptive period. They additionally asserted that the claims must be dismissed on the merits, because the plaintiffs did not state a claim for negligence, battery, or nuisance under Louisiana law.

On May 27, 2022, Judge Vance granted Shell's motion to dismiss without prejudice on the grounds of prescription and the non-applicability of *contra non valentem* and granted the Original Plaintiffs leave to amend their individual complaints to plead facts, specific to each plaintiff, to support the application of *contra non valentem* after their dates of diagnoses. Moreover, Judge Vance found that the Original Plaintiffs had not stated a claim for negligence under Louisiana law because they had no specific standard of care with which Evonik and Shell ought to have complied. Judge Vance granted in part Evonik's motion to dismiss without prejudice

and granted plaintiffs leave to amend their negligence allegations to articulate a specific duty of standard of care that the defendants are alleged to have breached. Finally, Judge Vance severed the Original Plaintiffs' claims into fourteen distinct civil actions.

Plaintiffs' case was allotted to this Court. Plaintiffs subsequently filed an amended complaint ("Amended Complaint") (Rec. Doc. 2), pursuant to Judge Vance's Order & Reasons (Rec. Doc. 1), and Shell and Evonik filed the instant motions to dismiss for failure to state a claim (Rec. Docs. 3, 11).

## **LEGAL STANDARD**

To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead sufficient facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the plaintiff pleads facts that allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The factual allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "[D]etailed factual allegations" are not required, but the pleading must present "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. The court must accept all well-pleaded facts as true and must draw all reasonable inferences in favor of the plaintiff. *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009). However, "'conclusory allegations or legal conclusions masquerading as factual

conclusions will not suffice to prevent a motion to dismiss.'" *Beavers v. Metro. Life Ins. Co.*, 566 F.3d 436, 439 (5th Cir. 2009) (citation omitted).

## DISCUSSION

The three main questions before the court are 1) whether Plaintiffs' claims are prescribed, 2) whether Plaintiffs' amended general negligence allegations articulate a specific standard of care and breach of that standard, and 3) whether Plaintiffs properly stated a nuisance claim under Articles 667-669.

**I. PRESCRIPTION**

Both Shell and Evonik contend that Louisiana's one-year prescriptive period applicable to delictual actions time-bars all of Plaintiffs' claims. (Rec. Doc. 3-1, at 1); (Rec. Doc. 11-1, at 4). In opposition, Plaintiffs argue that the prescriptive period was suspended under the doctrine of *contra non valentem* as to Shell and Evonik and under the continuing tort doctrine as to Evonik. (Rec. Doc. 7, at 4); (Rec. Doc. 11, at 3).

Article 3492 of the Louisiana Civil Code provides that "[d]elictual actions are subject to a liberative prescription of one year." La. Civ. Code art. 3492. This period "commences to run from the day injury or damage is sustained." *Id.*; *see also Brown v. R.J. Reynolds Tobacco Co.*, 52 F.3d 524, 527 (5th Cir. 1995) (quoting La. Civ. Code art. 3492). "Damage is considered to have been sustained, within the meaning of the article, only when it has manifested itself with sufficient certainty to support accrual of a cause of action." *Cole v. Celotex Corp.*, 620 So. 2d 1154, 1156 (La. 1993) (citing *McCray v. N.E. Ins. Co.*, 579 So. 2d 1156 (La. App. 2 Cir. 1991)).

Here, the Original Plaintiffs filed suit on April 21, 2021. (Rec. Doc. 3-1, at 1). Mrs. Foster's diagnosis in 2019 predated the April 26, 2020 cutoff required to render this suit timely. Accordingly, unless the one-year period was suspended or another exception applies, all of Plaintiffs' claims are prescribed. Plaintiffs do not dispute this proposition, but they argue that the prescriptive period was suspended under the doctrines of *contra non valentem* and the continuing tort doctrine. (Rec. Doc. 7, at 4-13); (Rec. Doc. 11, at 5-9).

### A. Contra Non Valentem

Under Louisiana law, *contra non valentem* is a doctrine that tolls the statute of limitations and is thus "an exception to the general rules of prescription." *Wimberly v. Gatch*, 635 So. 2d 206, 211 (La. 1994). This doctrine suspends the prescriptive period under certain circumstances, including situations in which the cause of action is not known or reasonably knowable by the plaintiff, even though his ignorance is not induced by the defendant. *Renfroe v. State ex rel. Dept. of Transp. & Dev.*, 809 So. 2d 947, 953 (La. 2002). But this exception, sometimes known as the "discovery rule," is available only in "exceptional circumstances." *Meggs v. Davis Mortuary Serv., Inc.*, 301 So. 3d 1208, 1213 (La. App. 5 Cir. 2020) (quoting *Renfroe*, 809 So. 2d at 953). Courts assessing the applicability of contra non valentem must focus on the reasonableness of the tort victim's action or inaction. *See Griffin v. Kinberger*, 507 So. 2d 821, 824 n.2 (La. 1987). As the Louisiana Supreme Court has explained:

> Prescription will not begin to run at the earliest possible indication that a plaintiff may have suffered some wrong. Prescription should not be used to force a person who believes he may have been damaged in some way to rush to file suit against all parties who might have caused that

5

> damage. *On the other hand, a plaintiff will be responsible to seek out those whom he believes may be responsible for a specific injury.*

*Jordan v. Emp. Transfer Corp.*, 509 So. 2d 420, 423 (La. 1987) (emphasis added).

The law is clear that the prescriptive period begins to run once a party has "constructive knowledge . . . of the facts that would entitle him to bring a suit," even if he does not have actual knowledge of those facts. *Campo v. Correa*, 828 So. 2d 502, 510 (La. 2002). "Constructive knowledge is whatever notice is enough to excite attention and put the injured party on guard and call for inquiry." *Id.* at 510–11. "Such notice is tantamount to knowledge or notice of everything to which a reasonable inquiry may lead," and therefore "is sufficient to start running of prescription." *Id.* at 511 (citations omitted); *see also Meggs*, 301 So. 3d at 1213 ("If the plaintiff could have discovered the cause of action by exercising reasonable diligence, the doctrine will not prevent the running of prescription." (citations omitted)); *Miles v. MEMC Pasadena, Inc.*, No. 08-4436, 2009 WL 1323014, at *3 (E.D. La. May 8, 2009) ("The plaintiff must show that the cause of action for his injuries was not reasonably knowable. This is a heavy burden."). The discovery rule provides that, for prescription to run, a plaintiff must have actual or constructive notice of the "tortious act, the damage caused by the tortious act, and the causal link between the act and the damage." *Ducre v. Mine Safety Appliances*, 963 F.2d 757, 760 (5th Cir. 1992) (citing *Knaps v. B & B Chem. Co.*, 828 F.2d 1138, 1139 (5th Cir. 1987)).

The question here is thus whether Mrs. Foster's cancer diagnosis and death put Mrs. Foster or the Plaintiffs "on guard and call[ed] for inquiry," such that there was constructive knowledge of the survival and wrongful death causes of action

6

against Shell and Evonik. If they had constructive knowledge as of the date of Mrs. Foster's diagnosis and subsequent death, then *contra non valentem* does not save their otherwise untimely claims.

To begin, despite Plaintiffs' own recitation of the carcinogenic effects of EtO that have been known and publicized for decades, they argue that *contra non valentem* should apply to toll their liberative prescriptive period because they could not reasonably have known of these effects. (Rec. Doc. 7, at 4). The crux of Plaintiffs' argument is that all of this information was "not communicated to any lay persons and the citizens of St. John the Baptist Parish . . . until 2021, when the first public outreach community meeting was organized by the EPA to inform local residents of the risk faced from living near the facility." (*Id.* at 9). In response, Shell argues that a medical diagnosis, in and of itself, constitutes constructive notice of a cause of action and triggers the duty to investigate. (Rec. Doc. 3-1, at 6). Moreover, Evonik contends that Plaintiffs' Amended Complaint lacks any factual allegations regarding the steps Mrs. Foster and her family took at the time of her diagnosis, or in the years following, to investigate a potential cause of her cancer. (Rec. Doc. 11-1, at 9). Accordingly, both Shell and Evonik assert that, at the time of Mrs. Foster's cancer diagnosis in 2019, Plaintiffs, individually and in his capacity as beneficiary of Mrs. Foster's cause of action, had constructive notice sufficient to trigger the running of prescription. (Rec. Doc. 3-1, at 6); (Rec. Doc. 11-1, at 11). Because suit was not timely filed within one year of this constructive notice, Shell and Evonik aver that Plaintiffs' claims are time-barred. (*Id.*). In opposition, Plaintiff argues that their inaction is reasonable in light

7

of their and Mrs. Foster's education, intelligence, and the nature of Shell and Evonik's conduct. (Rec. Doc. 12, at 5). Plaintiffs and the late Mrs. Foster, they contend, are lay people and members of the general public who were unaware of the EtO emissions because it is undetectable by sight or smell. (*Id.*). Moreover, they assert that they have no background or training in chemistry so "they could not have asked her physicians about possible causation related to EtO." (*Id.* at 6). Therefore, the question before the Court is whether a medical diagnosis, standing alone, constitutes constructive knowledge and triggers a duty to investigate.

State and federal case law regarding prescription and *contra non valentem* strongly suggest that a medical diagnosis puts a plaintiff on constructive notice of her cause of action, and thereby starts the prescriptive period. *Tenorio v. Exxon Mobil Corp.*, 170 So. 3d 269, 275 (La. App. 5 Cir. 2015) ("Although [plaintiff] claims to not have had knowledge of the radiation exposure at Alpha Tech, the commencement of prescription began when he should have discovered the facts upon which his cause of action was based, which was [when he was diagnosed with cancer] in November 2009."); *Lennie v. Exxon Mobil Corp*, 251 So. 3d 637, 648 (La. App. 5 Cir. 2018) (holding decedent's "diagnosis of lung cancer in January 2010 was constructive notice sufficient to put [the plaintiffs] on guard and to call for them to inquire further into the cause of his condition."); *Guerin v. Travelers Indem. Co.*, 296 So. 3d 625, 631 (La. App. 1 Cir. 2020) (finding plaintiff's "inaction was not reasonable in light of the knowledge that he possessed, and that his diagnosis in 2015 was constructive notice

8

sufficient to put him on guard and to call him to inquire into the cause of his condition.").

The Fifth Circuit recently considered this trio of above-cited cases and emphasized the significance of a medical diagnosis in starting a plaintiff's prescriptive period. *See Butler v. Denka Performance Elastomer, LLC*, 16F.4th 427, 439-40 (5th Cir. 2021). In *Butler*, the plaintiff alleged various health conditions resulting from chloroprene emissions from a nearby neoprene plant. *Id.* at 432. In holding that the plaintiff had adequately alleged *contra non valentem* at the pleadings stage, the court distinguished *Tenorio*, *Lennie*, and *Guerin*, as cases in which "a plaintiff's diagnosis, more than one year prior to filing suit, constitute[d] constructive notice." *Id.* at 440 (emphasis in original). The court stated that this "diagnosis" distinction is "critical," and that, because the *Butler* plaintiff "was not diagnosed or otherwise told that her symptoms were a result of excessive chloroprene emissions more than one year prior to filing suit," she was able to rely on *contra non valentem* at the pleadings stage. *Id.*

Plaintiffs further rely upon *Price v. Luster Products, Inc.*, in which another section of this Court found that *contra non valentem* applied because the plaintiff "was not made aware, nor had any reason to believe that the [hair relaxer] was related to her uterine fibroids until 2021." *Price v. Luster Prod. Inc.*, No. 21-1036, 2022 WL 1719274, at *3 (E.D. La. May 27, 2022). Moreover, the court noted that a Google search for the "causes of uterine fibroids" would not invariably lead the plaintiff to discover that her hair relaxer was the cause. *Id.* at *6.

9

> In fact, a mere google search instead suggests that the cause of uterine fibroids is unknown, and that genetics and exposure to estrogen may be contributing factors. Therefore, the fact that there may have been a journal article in 2013 suggesting that the use of hair relaxers could be related to uterine fibroids in no way demonstrates that it was unreasonable for Plaintiff not to discover the cause of her uterine fibroids earlier.

*Id.* Additionally, the court emphasized that the plaintiff presented to multiple urgent care facilities, and "Defendant's assumption that Plaintiff did not ask her physician about the cause of her condition is unfounded." *Id.* Notably, the court concluded its analysis with the assertion that "uterine fibroids are more common in African American women than in white women, suggesting that her doctor's failure to warn her of the risks may have been a byproduct of the historic trend of African American women's medical complaints being overlooked." *Id.*

In this case, Plaintiffs argue that like uterine fibroids, breast cancer has more than one potential cause. (Rec. Doc. 12, at 7–8). While this is true, Plaintiffs make no allegation that anyone inquired into what caused her breast cancer. The Amended Complaint is devoid of claims of asking a doctor what could have caused breast cancer or googling what could cause breast cancer. According to the Amended Complaint, no physician advised them that EtO may cause breast cancer. (Rec. Doc. 2, at 13). However, beyond these assertions, Plaintiffs do not allege that they and Mrs. Foster investigated or did any research into her cancer diagnosis. This is in contrast to the allegation in *LeBouef v. Evonik Corporation* in which the plaintiff alleged that "[s]he discussed a potential cause of cancer with her physician, and after genetic testing, he told her it was not caused by genetics. However, her physician did not offer any other

10

possible explanations despite her inquiries." No. 22-1523 (Rec. Doc. 2, at 12). Instead, here, Plaintiffs incorrectly focus their assertions on the fact that they did not know or have access to the body of industry and scientific information regarding the dangers of EtO.

For these reasons, the Court finds that Plaintiffs, individually and in their capacity as beneficiary of Mrs. Foster's cause of action, had constructive notice sufficient to trigger the running of prescription at the time of her diagnosis in 2019. Therefore, *contra non valentem* does not apply, and Plaintiffs' causes of action against Shell are dismissed. As to Plaintiffs' causes of action against Evonik, unless Plaintiffs can show that the continuing tort doctrine applies, their claims will be dismissed.

**B. The Continuing Tort Doctrine**

"The continuing tort doctrine is a jurisprudentially recognized exception to the general rules of prescription." *Watters v. Dept. of Soc. Serv.*, 15 So. 3d 1128, 1158 (La. App. 4 Cir. 2009). The doctrine provides that "[w]hen the tortious conduct and resulting damages continue, prescription does not begin until the conduct causing the damage is abated." *S. Cent. Bell Tel. Co. v. Texaco, Inc.*, 418 So. 2d 531, 533 (La. 1982). "When the tortious conduct is continuous and gives rise 'to successive damages, prescription dates from cessation of the wrongful conduct causing the damage.'" *Id.* If the wrongful act has been completed, but the plaintiff continues to experience injury even without further conduct by the tortfeasor, no continuing tort is found. *Hogg v. Chevron USA, Inc.*, 45 So. 3d 991, 1005 (La. 2010).

Here, Evonik argues that the continuing tort doctrine cannot be applied to suspend prescription as to Mrs. Foster because the allegedly harmful conduct is not causing Mrs. Foster successive damages. (Rec. Doc. 11-1, at 12). As Judge Vance found before severing these cases, "the continuing tort doctrine does *not* toll the survival and wrongful-death claims *of Ellis, Fortado, and Jack*, because Evonik's allegedly harmful conduct as to decedents is not causing successive damages to decedents or their survivors." *Ellis v. Evonik Corp.*, No. 21-1089, 2022 U.S. Dist. LEXIS 95318, at *9 (E.D. La. May 27, 2022) (emphasis added). "[F]or there to be a continuing tort there must be a continuing duty owed to the plaintiff and a continuing breach of that duty by the defendant." *In re Med. Rev. Panel for Claim of Moses*, 788 So. 2d 1173, 1180 (La. 2001) (citations omitted). Thus, Judge Vance dismissed the survival and wrongful death claims of only Ellis, Fortado, and Jack. Notably, Mrs. Foster was not listed here. In the same order, Judge Vance denied Evonik's motion as to all viable claims pled by the living plaintiffs were timely filed. (Rec. Doc. 1, at 24).

Mrs. Foster was a living plaintiff at the time the Original Complaint was filed, but she died in March 2022. Survival and wrongful death actions are subject to a prescriptive period of one year from the date of death. La. Civ. Code art. 2315.1(A); La. Civ. Code art. 2315.2(B). Filed on June 10, 2022, the Amended Complaint substituted Plaintiffs in as the proper parties only once Mrs. Foster died. Thus, Plaintiffs timely filed the Amended Complaint within the one-year prescriptive

12

period, so they incur the benefit of applying the continuing tort doctrine to render their claims against Evonik timely.

## I. Negligence

### A. Duty

Plaintiffs allege that Evonik is liable for negligence, and the parties' key dispute focuses on whether Plaintiffs adequately alleged a duty owed by Evonik. Under article 2315 of the Louisiana Civil Code, "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." La. Civ. Code art. 2315(A). Louisiana courts conduct a duty-risk analysis to determine whether to impose liability under article 2315. *Lemann v. Essen Lane Daiquiris, Inc.*, 923 So. 2d 627, 632-33 (La. 2006). Liability requires satisfaction of five elements: (1) the defendant had a duty to conform his conduct to a specific standard; (2) the defendant's conduct failed to conform to the appropriate standard; (3) the defendant's substandard conduct was a cause in fact of the plaintiff's injuries; (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries; and (5) actual damages. *Id.* at 633.

In *Butler v. Denka Performance Elastomer, LLC*, the Fifth Circuit considered plaintiff's appeal of the district court's dismissal of her claims arising from allegedly unsafe emissions of chloroprene in the community. 16 F.4th at 432. As to whether the plaintiff had adequately alleged a duty under Louisiana law, the court explained:

> Butler asserts that Denka violated Louisiana's general duty "to use reasonable care to avoid injury to another." *Rando v. Anco Insulations, Inc.*, 16 So. 3d 1065, 1086 (La. 2009). She says Denka's chloroprene emissions—untethered from

13

> any particular emissions threshold — are nonetheless unreasonably excessive . . .
>
> Butler's retreat to generalized grievances is unavailing. While Louisiana law does impose a "universal duty" on defendants in a negligence action to use "reasonable care," *Rando*, 16 So. 3d at 1086, plaintiffs are still required to assert a "specific standard" of care. *See Lemann*, 923 So. 2d at 633. The inquiry into a defendant's particular duty "is whether the plaintiff has any law (statutory, jurisprudential, or arising from general principles of fault) to support the claim that the defendant owed him a duty." *Id.*; *accord Boykin v. La. Transit Co.*, 707 So. 2d 1225, 1230 (La. 1998) (emphasizing that in a "proper duty-risk analysis" the court should first identify "the duty imposed upon the defendant by statute or rule of law") . . .
>
> Here, Butler relies not on the EPA, OSHA, or other agencies' recommended emissions thresholds but on generalized pronouncements that Denka has violated its duty to take "reasonable care." Yet, Butler points to no "statutory," "jurisprudential," or any other source of law—and we have likewise found none—in which such generalized references to "excessive emissions," "acceptable risk threshold," and "unreasonably dangerous emissions," constitutes a sufficient legal duty to support a negligence . . . claim. *See Bd. Of Comm'rs v. Tenn. Gas Pipeline Co.*, 850 F.3d 714, 727-28 (5th Cir. 2017) (dismissing negligence [claim] . . . because plaintiffs failed to allege an applicable legal duty under the federal and state statutory and regulatory schemes . . . ).

*Butler*, 16 F.4th at 443-46.

In the Original Plaintiffs' case, Judge Vance found that their complaint cited no cognizable source or articulation of the duty alleged. The Original Plaintiffs instead rested on the notion that Evonik had a broad duty to exercise "ordinary care," to "avoid an unreasonable risk of harm to persons located in the surrounding areas," and to "reduce emissions to a level that do[es] not pose an unreasonable risk of harm." But plaintiffs went no further. They failed to specify a "specific standard" of care with which Evonik should have complied. *See Lemann*, 923 So. 2d at 633. Thus, Judge

14

Vance dismissed the negligence claims without prejudice, granting leave to amend their individual complaints to allege a specific duty.

In amending their complaint, Plaintiffs in this case forewent the generalized pronouncements that Evonik had a duty to exercise "ordinary care" to not emit "excessive emissions" that posed an "unreasonable risk." Rather, the Amended Complaint now alleges that Evonik had a duty to conform to the standard of care set forth in the Environmental Protection Agency ("EPA") approved state operating permit program, which is administered by the Louisiana Department of Environmental Quality ("LDEQ"), and is set forth in the Louisiana Administrative Code Title 33, Part III. Specifically, the Amended Complaint alleges:

> Pursuant to the Code, the Defendants have a duty to control the overall emissions of EtO into the atmosphere through installing and diligently maintaining emissions control systems and equipment at 'point sources' where emissions are planned to occur and through a LDAR program to control unplanned fugitive emissions. Emission controls were to be installed and diligently maintained for the purpose of protecting public health, safety, and welfare regardless of whether the emissions are within permit limits and regulatory ambient air quality standards.

(Rec. Doc. 2, at 10-11 (citing 33 La. Admin. Code Pt. III, § 905,[1] § 2121[2])).

Evonik maintains that Plaintiffs still have failed to articulate a specific duty in the Amended Complaint. (Rec. Docs. 11-1, at 11-12). Evonik argues that Plaintiffs' reliance on the Environmental Regulatory Code to support their allegations of

---

[1] L.A.C. 33:III.905(a) provides, "Except as provided in Subsection B of this Section, to aid in controlling the overall levels of air contaminants into the atmosphere, air pollution control facilities should be installed whenever practically, economically, and technologically feasible. When facilities have been installed on a property, they shall be used and diligently maintained in proper working order whenever any emissions are being made which can be controlled by the facilities, even though the ambient air quality standards in affected areas are not exceeded."
[2] L.A.C. 33:III.2121 sets forth extensive, precise requirements to control fugitive emissions.

negligence "are far too vague and conclusory." (*Id.* at 14). Specifically, Evonik claims that "[b]y citing generally to the environmental code, . . . [Plaintiffs do] not establish a statutory, jurisprudential, or other rule of law that creates a specific duty of care that Evonik owed to them or Mrs. Foster, but rather asserts that the regulatory code establishes a blanket reasonableness standard with respect to emissions." (*Id.* at 13-14).

However, Evonik misrepresents Plaintiffs' citations to the Louisiana Administrative Code Title 33, Part III. Plaintiffs clearly cite to specific provisions, 33 La. Admin. Code Pt. III, § 905 and § 2121, which have been found to support legal duties in previous cases. In the recent state court decision, *Spencer v. Valero Refining Meraux, LLC*, the appellate court affirmed the district court's finding that the defendant refinery "had a duty to control the overall levels of air contaminants entering the surrounding area by conforming its conduct to a specific standard of care under LAC 33.III.905(A)." No. 21-3838, (La. App. 4 Cir. 2/2/22); 2022 La. App. LEXIS 157, at *7-8. Hence, state court precedent bolsters the finding that refineries and like facilities are held to a specific standard of care pursuant to the Louisiana Administrative Code Title 33, Part III.

Moreover, it is sufficient that Plaintiffs allege the legal standards expressed in 33 La. Admin. Code Pt. III, § 905 and § 2121 and apply the facts to the standards to render their expression of the law case-specific.[3] This is a far-cry from the *Butler*

---

[3] Plaintiffs allege, "[p]ursuant to the Code, the Defendants have a duty to control the overall emissions of EtO into the atmosphere through installing and diligently maintaining emissions control systems and equipment at 'point sources' where emissions are planned to occur and through a LDAR program to control unplanned fugitive emissions. Emission

16

plaintiff's allegations and the allegations in the unsevered Original Plaintiffs' complaint that generally alluded to "unreasonably excessive emissions." Thus, the Court finds that Plaintiffs articulate specific legal duties to control emissions expressed in sections of Louisiana Administrative Code Title 33, Part III, which Evonik must adhere to in operating the facility.

In sum, Plaintiffs have successfully amended their complaint to allege a specific standard of care, and the Court does not dismiss their negligence claim.

### B. Breach

Next, Evonik argues that even if Plaintiffs have alleged a specific duty of care, Plaintiffs have failed to properly allege that Evonik breached that duty of care. (Rec. Doc. 12-1, at 15). Specifically, Evonik contends that Plaintiffs do not identify any comments, findings, or information that support their conclusion that Evonik violated or otherwise failed to comply with the cited regulations. (*Id.* at 16). Plaintiffs' failure to include any facts that support their inferences that Evonik was using faulty equipment or failing to comply with a leak detection program, Evonik asserts, renders their First Amended Complaint insufficient. (*Id.* at 17). In reply, Plaintiffs argue that they provided a sufficient factual basis to support their allegations of breach. (Rec. Doc. 12, at 10-15).

The Amended Complaint alleges that "Defendants have operated the facility without sufficient emissions and leak controls to reasonably limit and/or eliminate

---

controls were to be installed and diligently maintained for the purpose of protecting public health, safety, and welfare regardless of whether the emissions are within permit limits and regulatory ambient air quality standards." (Rec. Doc. 2, 11-12).

17

the toxic EtO" (Rec. Doc. 2, at 8). Plaintiffs claim that "fugitive releases are caused by undetected and unrepaired leaks, faulty equipment, and other negligence." (*Id.*). Moreover, Plaintiffs allege that at a community outreach meeting regarding the facility's EtO emissions organized by the EPA with LDEQ,

> the EPA explained that, based on the cancer risk the facility's EtO emissions cause to the communities around it, the EPA considers the facility's emission levels to "not be sufficiently protective of human health" despite a reported reduction in emissions from 2014 to 2020. Even though the EPA advised that Evonik has decreased its EtO emissions from 2014 to 2020 by nearly 50%, the levels emitted were still not "sufficiently protective of human health" according to EPA guidelines and standards even though within permitted limits

(*Id.* at 10). Plaintiffs claim that the reduction in emissions from 2014 to 2020 was "mostly attributable to the facility reducing fugitive EtO emissions *i.e.*, unplanned emissions caused by leaks in equipment, faulty processes, accidents, and other negligence," and the facility was able to reduce unplanned fugitive emissions "mostly [as] the result of improvements in the facility's mandated leak detection and repair program ("LDAR")." (*Id.* at 10-11). Moreover, Plaintiffs allege that "the remaining reduction in EtO emissions was due to improvements to the operation of the facility's stack scrubber, which is the system and equipment used to control planned and known EtO emissions from the facility." (*Id.* at 11). Finally, Plaintiffs claim that, [a]ccording to the EPA, Evonik has plans to continue improving and 'enhancing' its LDAR program and scrubber operations to reduce further fugitive and planned EtO emissions from the facility . . . " (*Id.*). Finally, Plaintiffs allege that

> Defendants failed to act reasonably and diligently in controlling planned EtO emissions from its scrubber, located at a source point, and from unplanned fugitive emissions from leaks and faulty equipment and are

18

> still taking steps to try to conform their conduct to the required standards of care to protect the public health of the Plaintiff and other residents who have lived and still live near the facility.

(*Id.* at 12). Taken together, the Court finds that the above allegations in Plaintiffs' Amended Complaint are sufficient to state a claim to relief that is plausible on its face.

## II. Nuisance

Despite the fact Judge Vance previously found that the Original Plaintiffs properly stated a claim for nuisance in their original complaint, and amendment was unnecessary, Evonik once again argues that Plaintiffs' nuisance allegations are too vague and fail to adequately support the negligence element baked into the claim.[4] However, for the second time:

> [Evonik's argument] conflates the general negligence standard under article 2315 with the distinct negligence requirement for a nuisance claim under Louisiana's vicinage articles, which deal specifically with a proprietor's relationship to his neighbors . . . [and u]nlike their article 2315 general-negligence claims, plaintiffs' nuisance claims do not require an allegation of a separate source of duty.

*Ellis v. Evonik Corp.*, 2022 U.S. Dist. LEXIS 95318, at *39-40 (E.D. La. May 27, 2022). Judge Vance thus denied in part Defendants' motion to dismiss the Original Plaintiffs' nuisance claims. Here, the Court finds that Plaintiffs' allegations are sufficient at the pleadings stage to support a nuisance claim. Thus, the Court declines to reverse Judge Vance's ruling.

---

[4] To assert a nuisance claim, a plaintiff must show that "a defendant is (1) a proprietor who (2) *negligently* (3) conducts 'work' on his property (4) that causes damage to his neighbor." *Ictech-Bendeck v. Progressive Waste Sols. Of LA, Inc.*, 2019 U.S. Dist. LEXIS 147008, at *2 (E.D. La. Aug. 29, 2019) (citing *Bd. Of Comm'rs of Se. La. Flood Prot. Auth.-E v. Tenn. Gas Pipeline Co., LLC*, 88 F. Supp. 3d 615, 643 (E.D. La. 2015)) (emphasis added).

19

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Shell's *Rule 12(b)(6) Motion to Dismiss Claim* **(Rec. Doc. 3)** is **GRANTED** and Evonik's *Rule 12(b)(6) Motion to Dismiss* **(Rec. Doc. 11)** is **DENIED**.

New Orleans, Louisiana, this 9th day of August, 2022.

_____
CARL J. BARBIER
UNITED STATES DISTRICT JUDGE